TIMOTHY J. SWICKARD – SBN 208777
swickardt@gtlaw.com
TODD A. PICKLES – SBN 215629
picklest@gtlaw.com
GREENBERG TRAURIG, LLP
1201 K Street, Suite 1100
Sacramento, CA  95814-3938
Telephone:  (916) 442-1111
Facsimile:  (916) 448-1709

Attorneys for Plaintiff
DOUGLAS WALLACE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## EUREKA DIVISION

| | |
|---|---|
| DOUGLAS WALLACE,<br><br>          Plaintiff,<br><br>v.<br><br>VINCENT JAMES PATTERSON and DOES 1-10,<br><br>          Defendant. | **CASE NO.**<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL PENALTIES, COSTS AND DAMAGES**<br><br>**1)   Clean Water Act, 33 U.S.C. §§ 1251-1387;**<br><br>**2)   Trespass;**<br><br>**3)   Negligence;**<br><br>**4)   Negligence Per Se (2 causes of action)**<br><br>**5)   Private Nuisance;**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Douglas Wallace ("Plaintiff") files this complaint ("Complaint") against Vincent James Patterson ("Patterson"), and Does 1-10.

## JURISDICTION AND VENUE

1. This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, Title 33, United States Code Section 1251, *et seq.* (the "Clean Water Act" or the "Act") against Patterson and Does 1-10.

2. This Court has subject-matter jurisdiction over the parties and the subject matter of this action under Section 505(a)(1)(A) of the Act, Title 33, United States Code Section 1365(a)(1)(A), and Title 28, United States Code Section 1331 (an action arising under the laws of the United States). This Court has supplemental jurisdiction over Plaintiff's state law claims under Title 28, United States Code Section 1367.

3. The relief requested is authorized under Title 28, United States Code Sections 2201-02 (the power to issue declaratory relief in the case of actual controversy and further necessary relief based thereon), Title 33, United States Code Sections 1391(b) and 1365(a) (injunctive relief), and Title 33, United States Code Sections 1319(d) and 1365(a) (civil penalties).

4. On or around July 9, 2018, Plaintiff provided notice of Patterson's violations of the Act (the "CWA Notice Letter"), and of its intention to file suit against Patterson, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the United States Attorney General; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, North Coast Region ("Regional Board"); and to Patterson, as required by the Act, Title 33, United States Code Section 1365(b)(1)(A). A true and correct copy of Plaintiff's CWA Notice Letter is attached hereto as **Exhibit 1** and is incorporated by reference.

5. More than 60 days have passed since Plaintiff served his CWA Notice Letter on Patterson, and on the State and federal agencies. Plaintiff is informed and believes and thereon alleges that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint. The Plaintiff's claim for civil penalties is also

not barred by any prior administrative penalty under § 309(g) of the Act, Title 33, United States Code Section 1319(g).

6.     Venue is proper in the Northern District of California under § 505(c)(1) of the Act, Title 33, United States Code Section 1365(c)(1), because the sources of the violations are located within this judicial district.  Under Local Rule 3-2(f), intra-district venue is proper in Eureka, California, because the sources of the violations are located within Humboldt County.

## THE PARTIES

7.     Plaintiff owns and resides on a parcel of land in Humboldt County, California (the "Wallace Parcel") that he accesses via a road near the East Branch South Fork ("EBSF") of the Eel River, and through which an unnamed tributary to the EBSF of the Eel River flows.

8.     Plaintiff regularly, actively, and personally enjoys the ascetic and reactional aspects and benefits of the EBSF, which runs adjacent to his property.  An unnamed tributary of the EBSF flows through Plaintiff's property.  Plaintiff has also been active in environmental and ecological matters concerning the EBSF and Eel River for years, including preservation activities and efforts to reduce the environmental depravation of the EBSF and the Eel River.

9.     Patterson is an individual who owns two parcels of land in Humboldt County, California, which span a ridgetop in the northern central portion of the South Fork Eel River watershed, just southeast of Benbow, California (the "Patterson Parcels").  Plaintiff is informed and believes that Patterson used the Patterson Parcels for approximately 16,700 square feet of combined indoor (greenhouse) and outdoor cannabis manufacture, and resides on one or both of the Patterson Parcels.

10.     The true names and capacities of the defendants sued as DOES 1-10 are unknown to Plaintiff, who is informed and believes they are responsible for the harms alleged below.  Plaintiff will seek leave to amend this Complaint once their true names and capacities are ascertained.

## STATUTORY AND REGULATORY BACKGROUND

At all relevant times,

11.     Section 301(a) of the Act, Title 33, United States Code Section 1311(a), prohibits the "discharge of any pollutant by any person" into waters of the United States unless such discharge is authorized by a permit issued pursuant to the Act.

Case No.

12.     Section 502(5) of the Act, Title 33, United States Code Section 1362(5), defines a "person" to include, inter alia, an "individual."

13.     Section 502(12) of the Act, Title 33, United States Code Section 1362(12), defines a "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source."

14.     Section 502(6) of the Act, Title 33, United States Code Section 1362(6), defines a "pollutant" to include "dredged soil," "biological materials," "rock," "sand," and "cellar dirt," among things.

15.     "Navigable waters" means "waters of the United States." Title 33, United States Code Section 1362(7). Title 33, Code of Federal Regulations Sections 328.3(a)(1), (5), and (7) define the "waters of the United States" include tributaries to waters that are navigable and "wetlands" adjacent to navigable waters or their tributaries. "Wetlands" are defined as "those areas inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances to support, a prevalence of vegetation typically adapted for life in saturated soil conditions." Title 33, Code of Federal Regulations 328.3(b).

16.     A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, [or] container . . . from which pollutants are or may be discharged." Title 33, United States Code 1362(14).

17.     Sections 505(a)(1) and 505(f) of the Act provide for citizen enforcement actions against any "persons" for unpermitted discharges of pollutants. Title 33, United States Code Sections 1365(a)(1) and (f), Section 1362(5).

18.     An action for injunctive relief under the Act is authorized by Title 33, United States Code Sections 1319(b) and 1365(a).

19.     Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, Title 33, United States Code Sections 1319(d) and 1365, and Title 40, Code of Federal Regulations Sections 19.1 through 19.4.

Case No.

**FACTUAL ALLEGATIONS**

20.     On the evening of February 8, 2017, after approximately one week of moderate rainfall, residents around the Wallace Parcel and Patterson Parcels reported hearing a landslide, which it was later learned blocked the access road to the Wallace Parcel.

21.     On February 9, 2017, the California Department of Fish and Wildlife ("CDFW") Warden visited the Patterson Parcels and observed there was a section of a greenhouse used as part of a marijuana manufacturing operation near the edge of a ridgetop that had collapsed into the crown of the main scarp of a debris torrent (the "Patterson Torrent").

22.     A debris torrent is a shallow, water saturated landslide slurry of coarse-grain soil and debris that are the result of movement of saturated ground translating to rapid overland flow on steep slopes, which can incorporate slope vegetation, sediment, soil, and rock into an existing stream channel.

23.     Debris torrents are the result of movement of saturated ground translating to rapid overland flow on steep slopes, and can be triggered by external mechanisms: storm runoff, water release from storage, avalanche, rock-fall, seismic shaking, or by internal mechanisms such as progressive steepening of the debris front between successive surges.

24.     The Patterson Torrent was triggered by a roof collapse and flood of trapped water directly onto the ground adjacent to a steep slope.

25.     Plaintiff is informed and believes that the point sources for the Patterson Torrent and the subsequent on-going discharge of pollutants was and is the greenhouse, the unsealed well, and clearing on the Patterson Parcels.

26.     The Patterson Torrent flowed downslope within a valley until it merged into and surged down a stream channel through four parcels—including the Wallace Parcel—poured into the EBSF and, in the process, blocked Plaintiff's access to his property through the access road.

27.     The EBSF, is a tributary of the South Fork of the Eel River, and is a water of the United States.  Pursuant to Section 303(d) of the Clean Water Act, the South Fork of the Eel River is listed as impaired due to sediment and temperature.  Increased sediment and temperature caused by discharge of pollutants, including soil, sand, and debris, are detrimental to native cold water fish, such as Coho and Chinook salmon, and Steelhead.

28.    The elevation at the crown at the ridgetop of the landslide is approximately 1280 feet above mean sea level ("AMSL"), and the EBSF is approximately 400 feet AMSL at the tributary confluence, and thus the change in elevation is approximately 880 feet.

29.    On February 17, 2017, Regional and State Board staff inspected the Patterson Parcels with CDFW Watershed Enforcement Team staff to observe site conditions, including road areas and developed areas, onsite activities, overall site maintenance, and the use and diversion of water on the Patterson Parcels to evaluate impacts and potential impacts to the water quality and beneficial uses of receiving waters in the EBSF watershed (the "Inspection").

30.    During the Inspection, staff observed conditions on the Patterson Parcels that are associated with site development and use for cannabis manufacture and are typically recommended against near known or suspected landslides and unstable features:

(a)    A landing constructed at the top of the landslide scarp, which included pushing excess earthen material off the ridge to the top of the slide to create the landing.

(b)    An improperly sealed well at a location where leakage could saturate the soils and/or contribute to altered hydrology around the top of the slide.

(c)    A greenhouse near the top of the slide that had partially collapsed under snow loads during the previous winter and directed water toward the top of the slide.

(d)    An access road that lacked erosion features and showed signs of rilling in the roadway.

31.    The Patterson Torrent was found to have:

(a)    Resulted in significant sediment discharges into United States and State of California waters, directly and indirectly impacting beneficial uses and nuisance conditions.

(b)    Impacted the valley and the channel of an unnamed Class 3 tributary to the EBSF, scoured the tributary gorge to the bedrock, and removed vegetation approximately 6 to 15 feet above the bottom of the valley/thalweg of the watercourse bed.

(c)    Damaged and/or destroyed Plaintiff's access to the Wallace Parcel via the access road, a domestic water supply spring box on the Wallace Parcel and a water storage tank nearby, a

community water supply pipeline for a subdivision at the East Branch Road crossing, and two stream crossing culverts at the County Road and Graycliff Road on the Wallace Parcel.

(d)      Deposited scoured sediments and debris up to approximately 4-feet deep in several locations (including on top of the road crossings and below a waterfall in the channel along a flat area upstream of the County Road) and spread laterally in a fan-shaped pattern across the County Road.

(e)      Incised a new stream channel down to the bedrock approximately 6 inches deep into the bank of the EBSF and opened a 25-foot wide swath through the trees on the bank of the EBSF before reaching the river with its sediment and debris load.

32.      Based on observations made during the Inspection, water quality staff identified several locations with conditions that represent water quality violations or threatened violations requiring corrective action, including:

(a)      Unpermitted discharge of earthen materials to waters of the United States, and placement of material (landslide debris) where it can enter waters of the United States or the State of California.

(b)      Failure to enroll for coverage under the cannabis order.

(c)      Discharges of sediment to waters of the State of California in amounts that are deleterious to beneficial uses of water.

33.      Plaintiff is informed and believes that the greenhouse on the marijuana clearing at the Patterson Parcels was relocated in 2015 or 2016 from its original location to a location near the origination point of the landslide, and that the relocation caused the greenhouse roof collapse on February 8, 2017, which released trapped rainwater to the east of the greenhouse and marijuana clearing approximately 10 feet from the east edge of the ridge, which spilled off of the steep slope and percolated into the highly permeable surface through 40 feet of fractured rock.  The excess water at the slope top triggered the landslide starting at the ridgetop, and accelerated by additional water percolating through fractured rock and exiting at the spring. The combination of surface and spring flow drove the soil, sediment and vegetation landslide.

34.      Plaintiff is informed and believes and therefore alleges that pollutants that were discharged into the EBSF and the wetlands adjacent to the EBSF continue to remain in the EBSF and

COMPLAINT                                               Case No.

wetlands, and that pollutants continued to be discharged from the point sources on the Patterson Parcels into the EBSF and wetlands during significant storms in 2018 and 2019, and will continue to occur during significant storms thereafter until Patterson remediates the point sources on the Patterson Parcels.

35.     Plaintiff is further informed and believes that Patterson knows that the ongoing water discharges from the greenhouse and the marijuana clearing contain pollutants at levels exceeding EPA benchmarks and other water quality criteria since at least February 7, 2017.

36.     Plaintiff is further informed and believes that Patterson did not and has not obtained a permit for Patterson's discharges of pollutants into the EBSF and wetlands adjacent to the EBSF.

37.     Plaintiff is further informed and believes that prior to February 7, 2017, Patterson failed to inspect the property and identify potential erodible soils, sand, and other pollutants that would be discharged into the EBSF and wetlands adjacent to the EBSF, as well as causing damage to Plaintiff's real property.

38.     Plaintiffs is further informed and believes that Patterson did not obtain or have a permit from the County of Humboldt, State of California, that was required to manufacture marijuana at the Patterson Parcels.

39.     Additionally, Humboldt County ordinances required that any commercial manufacture of marijuana comply with all federal and state laws, and that permit holders be enrolled in certification with the North Coast Regional Water Quality Control Board.  Plaintiff is informed and believes that Patterson was not enrolled in certification with the Regional Board at any point prior to the discharge of pollutants in February 2017.

40.     Humboldt County ordinances further all placed limitations on activities within or affecting streamside management areas, and required site evaluations and/or permits for activities, including removal of trees or grading that would cause environmental impacts, including on slopes of greater than 15%.  Plaintiff is informed and believes and therefore alleges that Patterson's removal of trees, grading of his property, and construction of the greenhouse fell within land located in or affecting a streamside management area and that Patterson did not receive a site evaluation or permit required under Humboldt County ordinances.

## FIRST CAUSE OF ACTION

### (Clean Water Act Violation)

41.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

42.    As a result of Patterson's construction and maintenance of a greenhouse, unsealed well, and clearing for the manufacture of marijuana, all of which separately are point sources, on the ridgetop of the Patterson Parcels, Patterson added and continues to add pollutants, including but not limited to dredged soil, biological materials, rock, sand, and cellar dirt, into the waters of the United States, specifically the South Fork of the Eel River, including its tributary of the ESBF and wetlands adjacent to the EBSF, without authorization.

43.    The pollutants have remained in the waters of the United States, and Patterson's point sources are likely to continue to result in the discharge of pollutants into the waters of the United States.

44.    At no point has Patterson applied for, secured, or otherwise complied with the Clean Water Act, including obtaining any permits under Section 402 or 404 of the Act.

45.    Plaintiff is informed and believes, and thereupon alleges, that these discharges are adversely affecting the environment, and have injured the Plaintiff's use and enjoyment of the EBSF.

46.    Every day, since at least February 7, 2017, that Patterson has discharged and continues to discharge pollutants from the Patterson Parcels is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## SECOND CAUSE OF ACTION

### (Trespass)

47.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

48.    Plaintiff owned, occupied, and controlled the real property Wallace Parcel, which includes, but is not limited to, the access road to the parcel.

49.    Patterson recklessly and negligently caused entry onto the Wallace Parcel, including but not limited to runoff of water, soil, rocks, sand, and debris from Patterson's Patterson Parcels on or about February 8, 2017.

50.     Plaintiff did not give permission for Patterson's entry onto the Wallace Parcel.

51.     Plaintiff was actually harmed by Patterson's entry onto the Wallace Parcel.

52.     Patterson's entry and conduct was a substantial factor in causing Plaintiff harm.

### THIRD CAUSE OF ACTION

**(Negligence)**

53.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

54.     Patterson was the owner, occupant, and/or lessor of the Patterson Parcels.

55.     Plaintiff was the owner of the adjacent Wallace Parcels that were located downhill from the Patterson Parcels.

56.     Patterson was negligent in the use, maintenance, and/or management of the Patterson Parcels, including but not limited:

a.     constructing and relocating a greenhouse on the top of a ridgetop on the Patterson Parcels that exhibited past signs of landslide;

b.     removing trees and vegetation from the top and/or sides of a slope of greater than 15% on the Patterson Parcels;

c.     grading the area on top of a ridgetop on the Patterson Parcels that exhibited past signs of landslide;

d.     failing to properly seal a well Patterson caused to be dug on the Patterson Parcels;

e.     operating an unpermitted marijuana manufacturing site located on the Patterson Parcels;

f.     operating a marijuana manufacturing site that did not comply with Humboldt County ordinances;

g.     failing to maintain the roof of a greenhouse on the Patterson Parcel;

h.     allowing rain water to collect on the collapsed roof of the greenhouse on the Patterson Parcels;

i.     failing to enact erosion controls or diversion of runoff storm water from the Patterson Parcels onto the Wallace Parcel;

1    j.    failing to get a site evaluation and/or permit for construction, grading, and tree

2 removal on the Patterson Parcels; and

3    k.    failing to inspect or conduct visual observations of the condition of the Patterson Parcels.

4    57.    Patterson owed Plaintiff, an adjacent landowner, a duty of care with respect to the use,

5 maintenance, and management of the Patterson Parcels.

6    58.    Patterson's negligent conduct as alleged caused injury, damage, loss, or harm to Plaintiff.

7 **FOURTH CAUSE OF ACTION**

8 **(Negligence Per Se – Unpermitted Marijuana Cultivation)**

9    59.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth

10 herein.

11    60.    Humboldt County Commercial Medical Marijuana Land Use Ordinance, Ordinance No.

12 2544 ("the Ordinance") provided, among other things, that any marijuana manufacturing or cultivation

13 operation was required to obtain a permit from Humboldt County, on or before January 26, 2016.  The

14 Ordinance further required that, among other things, that applicant submit an operations plan that

15 included drainage, runoff, and erosion control and watershed and habit protection and that the applicant

16 provide a notice of intent and monitoring self-certification and other documents with the North Coast

17 Regional Water Quality Control Board demonstrating enrollment in Tier 1, 2, or 3, Regional Board

18 Order No. 2015-0023.

19    61.    Plaintiff is informed and believes, and thereupon alleges that Patterson operated a

20 marijuana manufacture and cultivation operation on the Patterson Parcels.

21    62.    Plaintiff is further informed and believes, and thereupon alleges that Patterson did not

22 obtain a permit for his marijuana manufacture and cultivation operation on the Patterson Parcels,

23 including on or before February 7, 2017.

24    63.    Plaintiff is further informed and believes, and thereupon alleges that Patterson did not

25 submit an operations plan that included drainage, runoff, and erosion control nor filed the self-

26 certification and other documents to the Regional Board as required under the Ordinance.

27    64.    Patterson's violation of the Ordinance was a substantial factor in causing harm to the

28 Plaintiff.

Case No.

**FIFTH CAUSE OF ACTION**

**(Negligence Per Se – Activities Affecting Streamside Management Area)**

65.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

66.     Humboldt County Code, Zoning Ordinance, Title III, Part 4, Section 314-61.1 ("Zoning Code"), provided for, among other things, limitations on activities in or affecting streamside management areas, including obtaining a site evaluation and/or special use permit with respect to grading, construction, and tree removal activities.

67.     Plaintiff is informed and believes, and thereupon alleges that Patterson's tree removal, grading activities, and construction of a greenhouse and marijuana manufacture operation at the top of the ridgetop along the Patterson Parcels fell within an area affecting a streamside management area as defined under the Zoning Code.

68.     Plaintiff is further informed and believes, and thereupon alleges that Patterson did not obtain a site evaluation and/or a permit for these activities on the Patterson Parcels, including on or before February 7, 2017.

69.     Patterson's violation of the Zoning Code was a substantial factor in causing harm to the Plaintiff.

**SIXTH CAUSE OF ACTION**

**(Private Nuisance)**

70.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

71.     Plaintiff owned the real property Wallace Parcel.

72.     Plaintiff is informed and believes, and thereupon alleges that Patterson was the owner, occupant, or lessor of the adjacent Patterson Property.

73.     Patterson, by acting or failing to act, including but not limited to the operation of a marijuana manufacturing operation, the construction of an unsealed well, and maintaining a partially collapsed greenhouse, on the Patterson Property, created a condition or permitted a condition to exist, including but not limited to the runoff of soil, sand, rocks, debris, and storm water, that was an

Case No.
COMPLAINT

obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property.

74.     There was no public benefit of the condition Patterson created, or permitted to exist through his failure to act.

75.     The condition that Patterson created, or permitted to exist through his failure to act, interfered with Plaintiff's reasonable use or enjoyment of his real property.

76.     Plaintiff did not consent to Patterson's conduct that created the condition or allowed the condition to be created on the Patterson Parcels.

77.     Plaintiff was harmed by Patterson's conduct, and this conduct was a substantial factor in causing Plaintiff's harm.

## **PRAYER**

WHEREFORE, Plaintiff Douglas Wallace prays for judgment as follows:

1.     Enjoin Patterson from discharging pollutants from the Patterson Parcels unless and until he is authorized through compliance with the Act;

2.     Compel Patterson to take appropriate actions to restore the quality of waters impaired or adversely affected by his activities;

3.     Assess and direct Patterson to pay civil penalties of $37,500 per day per violation for all violations pursuant to Sections 309(d) and 505(a) of the Act, Title 33, United States Code Sections 1319(d) and 1365(a), and Title 40, Code of Federal Regulations 19.1 through 19.4;

4.     Award Plaintiff: his costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, Title 33, United States Code Section 1365(d);

5.     Award Plaintiff his damages in an amount according to proof at trial;

6.     Award Plaintiffs his interest at the maximum legal rate as an element of damages; and

7.     Grant Plaintiff such other and further relief as the Court may deem just and proper.

///

///

///

1

## **DEMAND FOR JURY TRIAL**

2      Plaintiff, under Rule 38(b) of the Federal Rules of Civil Procedure, demands trial by jury as to all

3 legal matters contained in the Complaint.

4                                          Respectfully,

5

6 Dated:  July 24, 2019                    GREENBERG TRAURIG, LLP

7

8                              By:*/s/ Todd A. Pickles*_____
                                   Timothy J. Swickard
9                                  Todd A. Pickles
                                   Attorneys for Douglas Wallace

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **EXHIBIT 1 TO COMPLAINT**

**GT** GreenbergTraurig

Tim Swickard
Tel 916.442.1111
Fax 916.448.1709
swickardt@gtlaw.com

July 9, 2018

VIA FEDERAL EXPRESS

Mr. Vincent J. Patterson
931 Oakcrest Court
Garberville, CA 95542

Re:   *Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act and California Law*

Dear Mr. Patterson:

      I am writing on behalf of Douglas Wallace ("Wallace") in regards to violations of the Clean Water Act ("the Act") and California statutes and regulations occurring at your facility located in Humboldt County, California at APN 033-081-051-000, and APN 033-150-003-000 ("the Facility").

      This letter is being sent to you as the responsible owner, officer, and or operator of the Facility and shall hereinafter be referred to as "Patterson."

      This letter addresses Patterson's unpermitted and unlawful discharges of pollutants and sediments from the Facility into waters of the United States, i.e. the East Branch South Fork (EBSF) of the Eel River and placement of material (landslide debris) where it has destroyed Wallace's road access and waters system and continues to enter the Eel River, a water of the State and the United States.

      As such. Patterson is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit") and California Nuisance and Trespass law, in addition to other violations of California law and regulation.

      Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a), a citizen must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur. *See* 40 C.F.R. § 135.2.

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BERLIN*
BOCA RATON
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MEXICO CITY*
MIAMI
MILAN*
NEW JERSEY
NEW YORK
NORTHERN VIRGINIA
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SAN FRANCISCO
SEOUL*
SHANGHAI
SILICON VALLEY
TALLAHASSEE
TAMPA
TEL AVIV*
TOKYO*
WARSAW*
WASHINGTON, D.C.
WESTCHESTER COUNTY
WEST PALM BEACH

*OPERATES AS
GREENBERG TRAURIG GERMANY, LLP
* OPERATES AS A
SEPARATE UK REGISTERED LEGAL ENTITY
* OPERATES AS
GREENBERG TRAURIG S.C.
* STRATEGIC ALLIANCE
* OPERATES AS
GREENBERG TRAURIG LLP
FOREIGN LEGAL CONSULTANT OFFICE
* A BRANCH OF
GREENBERG TRAURIG P.A.,
FLORIDA, USA
* OPERATES AS
GT TOKYO HORITSU JIMUSHO
* OPERATES AS
GREENBERG TRAURIG GRZESIAK SP.K.

Vincent J. Patterson
July 9, 2018
Page 2

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Patterson is hereby placed on formal notice by Wallace, that after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, Wallace intends to file suit in federal court against Patterson under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a), for violations of the Clean Water Act and the General Permit and other applicable California law and statute. These violations are described more fully below.

## I.    Background

On the evening of February 8, 2017, after a week of moderate rainfall, local residents reported hearing a landslide that blocked Wallace's Humboldt County access road near the East Branch South Fork (EBSF) of the Eel River. The following day, Josh Zulliger, CDFW Warden, visited two properties discussed below, and noted at one property a section of a cannabis cultivation pad collapsed into the crown of the main scarp of a debris torrent.

A debris torrent, a sub-category of a debris flow, is a shallow depth, water saturated landslide slurry of coarse-grained soil and debris that can incorporate slope vegetation (mature trees and grasses) and soil/sediment/rock into an existing stream channel. Debris torrents are the result of movement of saturated ground translating to rapid overland flow on steep slopes. Debris torrents can be triggered by external mechanisms: storm runoff, water release from storage (log jams, etc.), avalanche, rock-fall, seismic shaking; or by internal mechanisms (primarily, progressive steepening of the debris front between successive surges). This debris torrent was triggered by the roof collapse and flood of trapped water directly onto the ground adjacent to a steep slope.

The debris torrent started at the edge of a ridgetop cultivation pad at the boundary of Humboldt County Assessor's Parcel Numbers APN 033-081-051-000 and APN 033-150-003-00; both are owned by Vincent J. Patterson. The debris torrent flowed downslope in a valley until it merged into and surged down a stream channel through the following parcels identified as APN 033-081-050-000, which is owned by Douglas Wallace Family trust; APN 033-081-053-000, owned by Cheryl Smith; APN 033-081-055-000, owned by Carolyn P Smith Trust; and APN 033-081-049-000, owned by Henry & Roberta Jasper, and poured into the East Branch South Fork of the Eel River; and most importantly eliminating Mr. Wallace's legal access to his property.

The affected Properties are six (6) parcels, including two adjacent Patterson parcels (APNs 033-081-051-000 and 033-150-003) spanning a ridge top used for approximately 16,700 square feet of combined greenhouse and outdoor cannabis cultivation, and four vertically descending residential parcels along the path of the debris torrent on private lands just southeast of Benbow, two and one half (2.5) miles southeast of Garberville, and less than a mile east of U.S. Highway 101.

Vincent J. Patterson
July 9, 2018
Page 3

An unnamed tributary to the East Branch flows through five of the six Properties. See Figures 1 and 2 for details. Figure 2 provides a general location and parcel map of the affected sites. Note that property lines are based on data provided by Humboldt County, which may be inaccurate up to several hundred feet, and is subject to improved accuracy upon property boundary surveys.

The Patterson parcels (APNs 033-081-051-000 and 033-150-003) spanning a ridge top are utilized for approximately 16,700 square feet of combined indoor (greenhouse) and outdoor cannabis cultivation. The Properties are in the northern central portion of the South Fork Eel River watershed on private lands just southeast of Benbow, two and one half (2.5) miles southeast of Garberville, and less than a mile east of US Hwy 101. An unnamed tributary to the EBSF Eel River flows through five of the six Properties.

The EBSF Eel River is a distance of approximately 2,070 feet horizontally (2249.29 feet slope distance) at an average slope of 42.51% from the ridgetop joining the two Patterson parcels, 1,350 feet from the common Wallace-Patterson parcel boundary, 475 from the midpoint of the common Patterson-Smith parcel boundary, 220 feet from the two Smith parcels' common central boundary, and 100 feet from the Smith-Jasper boundary. The EBSF Eel River flows through the Jasper parcel. Elevation at the crown at the ridgetop of the landslide is approximately 1280 feet above mean sea level (AMSL); the EFSB Eel River is approximately 400 feet AMSL at the tributary confluence. The change in elevation is approximately 880 feet.

On February 17, 2017, staff from the North Coast Regional Water Quality Control Board (Regional Water Board) and the State Water Resources Control Board, accompanied by staff of the California Department of Fish and Wildlife's (CDFW) Watershed Enforcement Team, inspected the above-referenced Facility. The purpose of the inspection was to observe site conditions, including roads and developed areas, onsite activities, and overall site maintenance, as well as water diversion and use on the Property, in order to evaluate impacts and potential impacts to the water quality and beneficial uses of receiving waters in the East Branch South Fork Eel River watershed.

During the February 17, 2017 inspection, staff observed the following conditions on the Patterson property associated with site development and use for cannabis cultivation that are typically recommended against in the vicinity of known or suspected landslides and unstable features.

- A landing constructed at the top of the landslide scarp; creation of this landing had included pushing excess earthen material off the ridge to the top of the slide.

- An improperly sealed well at a location where leakage could saturate soils and/or contribute to altered hydrology around the top of the slide.

- A greenhouse near the top of the slide which had partially collapsed under snow loads during the previous winter and directed water toward the top of the slide.

Vincent J. Patterson
July 9, 2018
Page 4

- An access road lacking erosion features that showed signs of rilling in the roadway.

The debris torrent resulted in significant sediment discharges to waters of the state and United States. The discharges led to both direct and indirect impacts to beneficial uses and nuisance conditions. The debris torrent impacted the valley and the channel of an unnamed Class 3 tributary to the East Branch South Fork Eel River (EBSF Eel River), scoured the tributary gorge down to bedrock, and removed vegetation approximately 6 to 15 feet above the bottom of the valley/thalweg of the watercourse bed and destroyed Wallace's legal access road to his property.

Additionally, the debris torrent destroyed the Wallace domestic water supply spring box, a water storage tank near the spring box, and a community water supply pipeline for a subdivision at the East Branch (County) Road crossing. Also damaged or destroyed were two stream crossing culverts at the County Road and Graycliff Road (Wallace property).

Staff observed scoured sediments and debris deposited up to 4 feet deep in several locations including: on top of the road crossings; in the channel, specifically below a waterfall along a flat area upstream of the County Road; and spread laterally in a fan-shaped pattern across the County Road. The debris torrent then incised a new stream channel down to bedrock approximately 6' deep into the bank of the EBSF Eel River and opened a 25-foot wide swath through the trees on the bank of the EBSF Eel River before reaching the river with its sediment and debris load.

There is a strong correlation between the existing greenhouse relocation in 2015 or 2016 nearer to the landslide and a subsequent greenhouse roof failure on the night of February 8, 2017 that released trapped rainwater. A collapsed roof directed the trapped water towards the east side approximately 10 feet from the east edge of the ridge. Water then spilled off the steep slope and percolated into the highly permeable surface through 40 feet of fractured rock. This excess water at the top of slope triggered the landslide, which started at the ridgetop and accelerated by the additional water percolating through fractured rock and exiting the spring. The combination of surface flow and spring flow drove the shallow soil, sediment, and vegetation landslide. Based upon observations made during the inspection, water quality staff identified several locations with conditions that represent water quality violations or threatened violations requiring corrective action.

- Unpermitted discharge of earthen materials to waters of the United States. Placement of material (landslide debris) where it can enter a water of the State and the United States.

- Failure to enroll for coverage under the cannabis order.

- Discharges of sediment to waters of the State in amounts deleterious to beneficial uses of water.

Vincent J. Patterson
July 9, 2018
Page 5

## II.    Legal Standard

### A.    The Clean Water Act

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges. *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutant by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements. 33 U.S.C. § 1311(a). The permit requirement extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6). A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "Navigable waters" means "the waters of the United States" and includes, for example, traditionally navigable waters and tributaries to such waters. U.S.C. § 1362(7); 33 C.F.R. § 328.333 (a)(1)-(7). Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States. *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

Wallace is informed and believes, and thereupon alleges, that Patterson has discharged, and continues to discharge, pollutants from the Facility to waters of the United States, through point sources, in violation of the terms of the General Permit, every day that there has been or will be any measurable discharge of storm water from the Facility since at least February 8, 2017. Each discharge, on each separate day, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These unlawful discharges are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Patterson is subject to penalties for violations of the Act since February 7, 2012.

### B.    Patterson Facility, Water Quality Standards, and EPA Benchmarks

Wallace is informed and believes that Patterson has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least February 7, 2012. Wallace alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since February 7, 2012, in which Wallace alleges that Patterson has discharged storm water containing impermissible levels of Total Suspended Solids, Specific Conductance, Oil and Grease in violation Effluent Limitation B(3), Discharge

Vincent J. Patterson
July 9, 2018
Page 6

Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the General Permit and the Act. Each violation in excess of receiving water limitations and discharge prohibitions is likewise a separate and distinct violation of the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Patterson is subject to penalties for violations of the General Permit and the Act since February 7, 2012.

The Properties are located in the lower East Branch of the South Fork Eel River watershed, specifically the Benbow Hydrologic Subarea of the South Fork Eel River Hydrologic Area, which corresponds to Hydrologic Unit Code 111.32. The South Fork Eel River is listed as impaired due to sediment and temperature pursuant to Clean Water Act section 303(d).

On December 16, 1999, the United State Environmental Protection Agency approved Total Maximum Daily Loads (TMDL) for temperature and sediment that indicate "Cold Water Fishery" as the most sensitive of beneficial uses in the watershed. Protection of this beneficial use is presumed to protect all beneficial uses that might be harmed by sedimentation or increased temperature. Increased sediment and summer temperatures are detrimental to native cold-water fish, such as Coho and Chinook salmon, and Steelhead.

The TMDL also indicates that major sources of sediment impairment in the South Fork Eel watershed are road-related and acknowledges the connection between anthropogenic sediment inputs and increases in stream temperatures.

The documented impairment by sediment of the majority of the area of Humboldt County and the North Coast Region is evidence that the implementation of existing programs used for the control of anthropogenic sediment waste discharges has not been adequate to protect, remediate, restore, and enhance sediment-impaired water bodies and to control the cumulative impacts of sediment waste discharges on such watersheds.

Excess sediment is defined as soil, rock, and/or sediments (e.g., sand, silt, or clay) from human related activities that is discharged to waters of the state in an amount that could be deleterious to beneficial uses or cause a nuisance. Some of the beneficial uses most sensitive to high sediment loads are associated with the migration, spawning, reproduction, and early development of cold water fish such as coho salmon, Chinook salmon, and steelhead trout. Besides harming aquatic life, excess sediment can limit the use of water for domestic consumption, agriculture, industry, wildlife, fishing, and recreation, and can cause or contribute to flooding. Excess sediment can also result in the exceedance of water quality objectives for suspended material, settleable material, sediment, and turbidity.

The Total Maximum Daily Load Implementation Policy Statement for Sediment Impaired Receiving Waters in the North Coast Region (Resolution R1-2004-0087), (the

Vincent J. Patterson
July 9, 2018
Page 7

Sediment TMDL Implementation Policy) recognizes the immediate need for the prevention and control of sediment waste discharges in 303(d)-listed waterbodies in the north coast.

The strategy for implementing the intrastate and interstate water quality objectives for temperature in the North Coast Region is set forth in the Policy Statement for Implementation of the Water Quality Objective for Temperature in the North Coast Region (the Temperature TMDL Implementation Policy). The Regional Water Board shall address sources of elevated water temperature region-wide but on a case-by-case basis in the context of a given permit or other action as appropriate and necessary to reduce impairments and prevent further impairment. The water quality objectives for temperature shall be implemented through a combination of riparian management and other temperature controls as appropriate in nonpoint source control programs; permits and waivers, grants and loans, and enforcement actions; support of restoration projects; and coordination with other agencies with jurisdiction over controllable factors that influence water temperature.

Controllable water quality factors affecting water temperature include, but are not limited to, any anthropogenic activity which results in the removal of riparian vegetation that provides shade to a waterbody, sediment discharges, impoundments and other channel alterations, the reduction of instream summer flows, and the reduction of cold water sources.

The Regional Water Board's Order R1-2015-0023 implements both the Sediment and Temperature TMDL Implementation Policies and addresses sediment and temperature impairments by requiring: 1) the application of Best Management Practices (BMPs) to avoid excess sediment and other waste discharges; 2) the protection and maintenance of riparian conditions and shade; 3) inventories, prioritization and remediation of sediment delivery sites; 4) implementation and effectiveness monitoring of BMPs and documentation of the monitoring results; 5) water conservation and measures to ensure that water diversions do not unreasonably impact beneficial uses; and 6) on-going education and outreach.

Compliance with the standard conditions contained in the Order serve to prevent or minimize a site's contribution to watershed impairments and, thus, represent compliance or progress toward compliance with applicable sediment and temperature TMDLs, subject to periodic review, monitoring and reassessment.

The Order, adopted on August 13, 2015, regulates the discharge of waste associated with the cultivation of cannabis and/or other operations with similar environmental effects on private lands in the North Coast Region. The Order applies to all private properties in the North Coast Region upon which cannabis is being cultivated and requires that, as of February 15, 2016, any parcel with a cumulative area of cannabis cultivation that comprises an area of 2,000 square feet or more must enroll for coverage under and comply with the requirements of the Order.

As of the time of the inspection, the Patterson property was not enrolled for regulatory coverage under Order R1-2015-0023 (Order), though site conditions require enrollment. Compliance with the Order requires that enrollees with site conditions that require some level of corrective action enroll in Tier 2 and develop a Water Resource Protection Plan, including a

Vincent J. Patterson
July 9, 2018
Page 8

property-wide inventory of controllable sediment discharge sites. Enrollees with site conditions that pose an immediate threat to water quality and require cleanup, restoration and/or remediation enroll in Tier 3 and develop a cleanup and restoration plan.

Had the property owner elected to comply with the requirement to enroll for coverage under and comply with the requirements of the Order, site review(s)/inspection(s) associated with preparation of the enrollment documents, monitoring and reporting program, and water resource protection plan may have enabled the property owner to identify and/or become aware of potentially unstable areas on the property and to take steps to reduce or avoid impacts to those features.

**C.     Patterson Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan**

Section A(1) and Provision E(2) of the General Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the Facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the Facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective

Vincent J. Patterson
July 9, 2018
Page 9

(General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure
effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).
Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to
the appropriate Regional Water Board that describes the BMPs that are currently being
implemented and additional BMPs that will be implemented to prevent or reduce the
discharge of any pollutants causing or contributing to the exceedance of water quality
standards.

Wallace's investigations and reviews of publicly available documents regarding
conditions at the Facility indicate that Patterson has been operating with an inadequately
developed or implemented SWPPP in violation of the requirements set forth above.
Patterson has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as
necessary.  Accordingly, Patterson has been in continuous violation of Section A(1) and
Provision E(2) of the General Permit every day since February 7, 2012, and will continue
to be in violation every day that it fails to develop and implement an effective SWPPP.
Patterson is subject to penalties for violations of the General Permit and the Act occurring
since February 7, 2012.

**D.     Patterson Has Failed to Address Discharges Contributing to Exceedances of
Water Quality Standards**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a
report to the Regional Board describing changes it will make to its current BMPs in order
to prevent or reduce the discharge of any pollutant in its storm water discharges that is
causing or contributing to an exceedance of water quality standards.  Once approved by
the Regional Board, the additional BMPs must be incorporated into the Facility's
SWPPP.

The report must be submitted to the Regional Board no later than 60-days from
the date the discharger first learns that its discharge is causing or contributing to an
exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a).
Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report
any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires
an annual evaluation of storm water controls including the preparation of an evaluation
report and implementation of any additional measures in the SWPPP to respond to the
monitoring results and other inspection activities.

As indicated above, Patterson is discharging elevated levels of Total Suspended
Solids, Specific Conductance, Oil and Grease, and other unmonitored pollutants that are
causing or contributing to exceedances of applicable water quality standards.  For each of
these pollutant exceedances, Patterson was required to submit a report pursuant to Receiving
Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water
exceeding the EPA Benchmarks and applicable water quality standards.

Vincent J. Patterson
July 9, 2018
Page 10

Based on Wallace's review of available documents, Patterson was aware of high levels of these pollutants long before October 29, 2009. Patterson has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Permit every day since February 7, 2012, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. Patterson is subject to penalties for violations of the General Permit and the Act occurring since February 7, 2012.

## III.    Persons Responsible for the Violations

Wallace puts Patterson on notice that he is the person responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, Wallace puts on formal notice that it intends to include those persons in this action.

## IV.    Name and Address of Noticing Parties

The name, address and telephone number of each of the noticing parties is as follows:

Douglas F. Wallace
1100 East Branch Road, Garberville 95542;
P.O. Box 554
Garberville, CA 95542.

## V.    Counsel

Wallace has retained legal counsel to represent it in this matter. Please direct all communications to:

Tim Swickard
Greenberg Traurig, LLP
1201 K Street, Suite 1100 | Sacramento, CA 95814
T +1 916 868 0688  | F 916.448.1709  | C 530.574.6108
swickardt@gtlaw.com  |  www.gtlaw.com

## VI.    Penalties

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Patterson to a penalty of up to $37,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit. In addition to civil penalties, Wallace will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a)

Vincent J. Patterson
July 9, 2018
Page 11

and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

Wallace believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Patterson and his agents for the above-referenced violations upon the expiration of the 60-day notice period.

If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Very truly yours,

Tim Swickard
Shareholder

TS:db

cc:  Service List

Vincent J. Patterson
July 9, 2018
Page 12

## SERVICE LIST

Scott Pruitt, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Mike Stoker
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Jeff Sessions
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Eileen Sobeck, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Matthias St. John, Executive Officer
North Coast Regional Water Quality Control Board
5550 Skylane Blvd Ste A
Santa Rosa Ca 95403-107